IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 1:25-mj-325 |
| | ) | |
| NATHAN VILAS LAATSCH | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S MOTION FOR DETENTION**

Defendant NATHAN V. LAATSCH ("Laatsch" or "the defendant"), without authorization, stole and attempted to transmit classified national defense information to a foreign government. The defendant has been charged with violating the Espionage Act, 18 U.S.C. § 794(a), a charge that is among the gravest of national security offenses.

The Bail Reform Act of 1984, 18 U.S.C. §§ 3141-3150, authorizes this Court to detain Laatsch pending trial if the Government proves *either* by a preponderance of the evidence that no "conditions of release . . . will reasonably assure" the defendant's appearance *or* by clear and convincing evidence that the defendant is a danger to the "safety of any other person [or] the community." *Id*. § 3142(g). Here, both grounds warrant the defendant's detention.

First, the defendant poses a serious flight risk. The defendant faces life imprisonment for his crime. The evidence—which includes videos of the defendant exfiltrating classified information in his socks, depositing the classified information where he believed it would be retrieved by a foreign government, and later freely admitting to doing so—is overwhelming. The defendant will inevitably be terminated from his role at the Defense Intelligence Agency ('DIA')

1

and appears to lack any other significant ties to this District. And, significantly, the defendant has already expressed a willingness and a desire to flee the United States. There is simply little incentive for the defendant to remain in this District—or even in the United States—to face the consequences of his actions, and there is no combination of conditions that will reasonably assure his presence at future proceedings.

Second, the defendant poses a danger to the community in that he is an ongoing risk to the national security of the United States. The defendant has disclosed only a small portion of the classified national defense information either in his possession, or that he has accessed and otherwise knows. In addition to the documents that he transcribed, the defendant has advanced knowledge of the U.S. Government's counterintelligence monitoring capabilities—information that he volunteered to an individual who he believed to be an official of a foreign government. That advanced knowledge would be exceptionally valuable to anyone seeking to evade detection and monitoring on U.S. Government systems—including foreign adversaries who, at any given time, are seeking the assistance of U.S. Government insiders to gain access to classified information.

For each of these reasons, and as discussed in greater detail below, the United States of America, by and through its attorneys, Erik S. Siebert, United States Attorney for the Eastern District of Virginia, Sue J. Bai, Head Supervisory Official for the National Security Division, and undersigned counsel, moves this Court, pursuant to 18 U.S.C. § 3142, to order the defendant's detention.

## I.    BACKGROUND

The defendant, twenty-eight years old, joined the DIA as a civilian employee in August 2019. Compl. ¶ 18. At the time of his arrest, the defendant was employed as a Data Scientist and

IT Specialist of Information Security in Washington, D.C., where he worked with the Insider Threat Division to, among other things, conduct monitoring on individuals who were under investigation. *Id.* As required for his role, the defendant held a Top Secret security clearance. *Id.* ¶ 19.

Prior to being granted his security clearance, the defendant signed multiple security and non-disclosure agreements in which he agreed never to disclose classified information to unauthorized persons. Declaration of Matthew T. Johnson ("FBI Decl.") ¶¶ 4-5; *see also* Attachments A-B. In each one of those agreements, the defendant also acknowledged that the unauthorized disclosure of classified information could constitute a criminal offense and could cause "irreparable injury to the United States or be used to advantage by a foreign nation." *Id.*

Notwithstanding the defendant's promises, in March of this year, the defendant reached out to a foreign government ("Country 1") and volunteered to pass classified U.S. intelligence information to that government. Compl. ¶ 9. The defendant's actions were motivated by animus towards the current trajectory of the U.S. Government. *Id.*

When the FBI assumed the role of a Country 1 official and began communicating with the defendant, the defendant carefully selected classified information "based on [Country 1's] assumed interest," *id.* ¶ 43, and spent hours transcribing classified documents at his desk before surreptitiously exfiltrating those transcriptions. *Id.* ¶¶ 33-35. The defendant was captured on video in his DIA workspace reviewing, transcribing, and exfiltrating the classified information in his socks and/or his lunch bag. *Id.*

On May 1, 2025, the defendant attempted to transmit the classified information to Country 1. *Id.* ¶¶ 16, 40-42. The defendant was observed departing his home and proceeding to a location provided by the FBI, where FBI video surveillance recorded the defendant depositing an object at

the designated location. *Id.* That object was a thumb drive, which contained nine typed documents bearing classification markings and a note from the defendant about the classified information he selected to transmit to Country 1. *Id.* ¶¶ 42-43. An Original Classification Authority at one or more U.S. Government agencies has confirmed that eight of the nine documents were classified as Top Secret and contained Sensitive Compartmented Information ("SCI"). *Id.* ¶ 44.

But the defendant was not done. To the contrary, the defendant "expect[ed] there to be more routine exchanges in the future" and sought "contingencies" from Country 1. *Id.* ¶ 46. Specifically, in return for his service to Country 1, the defendant sought citizenship from Country 1. *Id.* ¶ 47. Thus, when the FBI—still posing as a Country 1 official—asked if the defendant could procure information on specific topics, the defendant responded later that same day that he could. *Id.* ¶ 49. Beginning the next day, DIA videos in the defendant's workplace again captured the defendant transcribing classified information at his desk and exfiltrating those transcriptions. *Id.* ¶ 50. And on May 29, 2025, the defendant again proceeded to a location provided by the FBI in an attempt to transmit that information to Country 1. FBI Decl. ¶ 9. The defendant was instead arrested after electronically transmitting more than twenty documents—all of which included classification markings—to the FBI. *Id.*

## II.    STANDARD OF PROOF AND STATUTORY FACTORS

"The facts the judicial officer uses to support a finding pursuant to subsection (e) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence." 18 U.S.C. § 3142(f)(2)(B). Because the Bail Reform Act specifies no heightened standard of proof for flight risk (*expressio unius est exclusion alterius*), courts need only find a risk of flight by a preponderance of the

evidence. *United States v. Stewart*, No. 01-4537, 2001 WL 1020779, at *48 (4th Cir. Sept. 6, 2001).

Either flight risk or dangerousness warrants detention. *See id.* Both are not required to detain the defendant pending trial. *See id; see also United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986) (per curiam) ("[E]ither danger to the community or risk of flight is sufficient to authorize detention.") (citations omitted); *United States v. Daniels*, 772 F.2d 382, 383 (7th Cir. 1985) ("That the evidence supports only one [basis to detain] is no reason to let Daniels out; one is quite enough."); *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985) ("[T]he lack of reasonable assurance of *either* the defendant's appearance *or* the safety of others or the community is sufficient [to support pretrial detention]; both are not required.").

In evaluating the defendant's flight risk and dangerousness, the Bail Reform Act, 18 U.S.C. § 3142(g)(1)-(4), instructs the Court to consider four factors: (1) the offense charged; (2) the weight of the evidence; (3) personal characteristics; and (4) dangerousness. With respect to dangerousness, the Senate Report accompanying the Bail Reform Act explains that dangerousness is not limited to physical violence and includes continued criminal activity:

> The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. The committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.

S. Rep. No. 98-225, 98th Cong., 1st Sess. 12 (1983), *as reprinted in* 1984 U.S.C.C.A.N. 3182, 3195; *see United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Danger, in this context, was not meant to refer only to the risk of physical violence.").

In prior cases alleging unauthorized removal and disclosure of classified national defense information—even where that information was not intended for a foreign government, as was the

case here—courts have readily found that the risk of future disclosures is a danger to the community sufficient to support pretrial detention. *See United States v. Teixeira*, 1:23-cr-10159-IT, Dkt. 37 (D. Mass. May 22, 2023) ("I find that Defendant's release threatens U.S. national security. . . . The risk of future disclosures is intolerable: it could jeopardize the safety of soldiers, citizens, and allies of the United States. Moreover, Defendant's knowledge of TS/SCI does not end with termination of TS/SCI access. He transcribed, photographed, and discussed TS/SCI, and, at a minimum, retains recall of such information."); *United States v. Winner*, 1:17-cr-00034-JRH-BKE, Dkt. 163, at 14 (S.D. Ga., Nov. 27, 2017) ("Given the uncertainty with respect to Defendant's level of knowledge or possession of classified information, together with evidence that she planned to anonymously release information to online news outlets and that she has antipathy toward the United States, the Court finds that releasing Defendant prior to trial would pose a danger to the community, particularly to the national security."); *United States v. Martin*, 1:17-cr-00069-RDB, Dkt. 24 (D. Md., Oct. 21, 2016) ("Under 3142(g)(4) – if considered, [the defendant's] release presents a serious risk of danger to the *public due to his information, knowledge he possesses.*") (18 U.S.C. § 793 charge; emphasis added).

### III.    ANALYSIS OF THE STATUTORY FACTORS

Each of the statutory factors weighs in favor of the defendant's detention. *See* 18 U.S.C. § 3142(g). The Government will address each in turn.

### 1. <u>The Nature and Circumstances of the Offense</u> – 18 U.S.C. 3142(g)(1)

The Complaint charges the defendant with attempting to transmit national defense information to a foreign government, in violation of Section 794(a). The majority of the information the defendant attempted to transmit on May 1, 2025 was classified as Top Secret—information the defendant knew could reasonably be expected to cause "exceptionally grave

damage to the national security." Exec. Order No. 13526, 75 Fed. Reg. 707, 707 (Dec. 29, 2009). But the defendant was not constrained by the risk that his actions could damage U.S. national security, just as he was not constrained by the oath he took as a DIA employee to "support and defend the Constitution," and to "bear true faith and allegiance to the same," nor by his multiple NDAs in which he agreed not to disclose classified information. FBI Decl. ¶¶ 4-6. Instead, the defendant was motivated by a selfish animus towards the U.S. Government—an animus that led him to disclose multiple classified reports to an individual he believed to be associated with a foreign government and, as the Government recently learned, to attempt to disclose classified information to a second foreign government. *See* FBI Decl. ¶ 10(a). But the defendant was not motivated *solely* by his misguided ideology—as abhorrent as that alone would be. Rather, the defendant sought to convert his position of trust into something of value for himself—citizenship of a foreign country.

In pursuing those motives, the defendant egregiously abused the trust and access afforded to him by the U.S. Government. He disregarded his oath and placed his own interests above those of the U.S. Government and his fellow citizens who are made safer as a result of the United States's unique ability to collect timely and valuable intelligence—intelligence the defendant sought to compromise. Indeed, the defendant's attempted exposure of critical intelligence sources and methods—to say nothing of the fact that the defendant exfiltrated classified information and stored it in an unsecure location—jeopardized the efficacy and utility of critical intelligence sources and methods. That the defendant attempted to transmit the information to a friendly foreign government is of no import; any exposure of U.S. intelligence sources or U.S. intelligence collection methods has the ability to degrade or disrupt U.S. intelligence collection. Moreover, once those sources and methods are out of the control of the United States, the United States loses

7

the ability to limit further access to its intelligence, thus jeopardizing the security of sources and the continued utility of its methods. Once lost or exposed, sources and methods can take years to reestablish, if they can be reestablished at all.

Congress has recognized the seriousness of the defendant's crime by providing the maximum possible penalties—life imprisonment or death—for violations of the Espionage Act. This is because, by definition, the defendant created a risk of "serious" and "exceptionally grave damage" to U.S. national security through his actions. *See* Exec. Order No. 13526, 75 Fed. Reg. 707 § 1.2(a). In short, the nature of the charged offense weighs heavily in favor of detention.

## 2. Weight of the Evidence – 18 U.S.C. 3142(g)(2)

The weight of the Government's evidence is overwhelming. The defendant was captured on video surreptitiously transcribing and exfiltrating classified information from his DIA workspace and then depositing a thumb drive with nine classified documents at a location where he believed it would be retrieved by Country 1. The defendant was subsequently captured on video and arrested immediately after electronically transmitting more than twenty additional documents appearing to contain classified information to a site he believed to be controlled by Country 1. Handwritten documents containing classification portion-markings were located during a search of the defendant's residence, FBI Decl. ¶ 11, and trash bags of shredded documents—including documents containing handwritten material—were retrieved by the FBI after the defendant attempted to dispose of them in the dumpster outside his residence. *Id.* And there is also digital evidence linking the defendant with the email account he first used to reach out to Country 1 and then used to communicate with the FBI. In this District, "such evidence weighs heavily against Defendant" and in favor of detention. *United States v. Riley*, 635 F. Supp. 3d 411, 417 (E.D. Va. 2022) (finding surveillance footage of defendant committing the crimes to be compelling); *see*

*also United States v. Mallory*, 268 F. Supp. 3d 854, 863-64 (E.D. Va. 2017) (finding, in a case brought under 18 U.S.C. § 794(a), that "the weight of the evidence against defendant is significant and substantial, and thus increases the risk that the defendant will flee").

### 3. <u>The History and Characteristics of the Defendant</u> – 18 U.S.C. 3142(g)(3)

The defendant is a twenty-eight-year-old man who is facing exceptionally grave legal peril in the U.S. criminal justice system. As multiple courts have noted, the more severe the sentence, the greater a defendant's incentive to flee. *See United States v. Jones*, 8-mag-1228 (HBP), 2008 WL 243131, at *4 (S.D.N.Y. June 12, 2008) ("The severity of the crime and the severity of the potential sentence create risks of dangerousness and non-appearance that weigh in favor of detention."); *United States v. Stanford*, 630 F. Supp. 2d 751 (S.D. Tex. 2009) ("The severity of the potential sentence [375 months] weighs heavily in favor of detention."). Here, the defendant faces among the most significant of sentences—life imprisonment.

The defendant's desire to flee need not be considered in the abstract. The defendant sought assistance from Country 1 to facilitate his flight. He requested citizenship, expressed a desire to "pursue an alternative," and demonstrated his willingness to repeatedly violate U.S. law in return for Country 1's assistance. *See* Compl. ¶ 47. The defendant's desire to leave, in combination with the animus he expressed towards the U.S. Government and the loss of his employment, provide the defendant with few incentives to stay and many to leave.[1]

Moreover, the defendant has no family and few ties to this District, other than his prior employment with the U.S. Government. He does not own his home and appears to lack any other meaningful ties to the community. The defendant faces indictment on serious charges that carry a

---

[1] The Government also notes that on May 19, 2025, the defendant applied to renew his U.S. passport. FBI Decl. ¶ 8.

significant sentence, his future employment prospects are limited, at best, and there is every reason to believe that the defendant's animus towards the U.S. Government will have increased, rather than abated.

Although the defendant has no prior criminal record, most individuals who commit espionage do not. That is because a criminal record would likely bar them from obtaining a security clearance in the first place. Regardless, lack of a prior criminal record is not sufficient, on its own, to warrant release. Rather, the history and characteristics of the defendant must be considered in their entirety.

Here, the history and characteristics of the defendant support detention. When the defendant thought no one was looking, he egregiously violated his oath and his position of trust with the DIA. Neither his word nor multiple NDAs were enough to stop the Defendant from pursuing his own agenda. And there is nothing to suggest that any conditions imposed by this Court would constrain the defendant now or that his word is any more reliable, given the dire consequences he is facing. *See United States v. Dalke*, 1:22-cr-00313, Dkt. 24 at 3 (D. Co. Oct. 11, 2022) ("The Defendant signed a lifetime NDA with the government (and related non-disclosure statements) which he failed to honor. The document warned violating its terms would subject him to criminal sanctions, including the very charges he now faces. The Court is not convinced Defendant would honor its conditions of release any better."). The defendant's history and characteristics weigh in favor of detention.

### 4.  <u>Dangerousness</u> – 18 U.S.C. 3142(g)(4)

For the reasons discussed below, the defendant poses a clear and continuing danger to the U.S. national security and to the public at large. This factor thus also weighs in favor of detention.

10

IV.    **THE DEFENDANT SHOULD BE DETAINED BECAUSE THE DEFENDANT IS A DANGER TO U.S. NATIONAL SECURITY AND THE COMMUNITY AT LARGE**

As discussed above, the "safety of the community" concern expressed in 18 U.S.C. § 3142 encompasses more than merely danger of harm involving physical violence.  Courts have recognized that a threat to the safety of the community may include, for example, a continuing generalized threat of criminal activity.  *See United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993); *United States v. Castro*, 2:15-mj-154, 2015 WL 13357649 (N.D. Ala. June 22, 2015) ("The term 'dangerousness,' as used in the Bail Reform Act of 1984, has a much broader construction than might be commonly understood in everyday parlance.").

As relevant here, the Supreme Court has unequivocally held that protecting the secrets that contribute to the U.S. national security is vital.  *See Haig v. Agee*, 453 U.S. 280, 307 (1981) ("It is 'obvious and unarguable' that *no governmental interest is more compelling* than the security of the Nation.") (emphasis added).  More particularly, "'[t]he Government has a substantial interest in protecting sensitive sources and methods of gathering information,'" *United States v. Abu Ali*, 528 F.3d 210, 247 (4th Cir. 2008) (quoting *United States v. Smith*, 780 F.2d 1102, 1108 (4th Cir. 1985)), and in "protecting both the secrecy of information to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service.'"  *Abu Ali*, 528 F.3D at 247 (quoting *CIA v. Sims*, 471 U.S. 159, 175 (1985)).  Any continuing criminal threat to national security interests logically must fall within the purview of the Bail Reform Act.

Here, the classified information to which the defendant had access and which the defendant knows by virtue of his position working with counterintelligence matters far exceeds the more than two dozen documents the defendant attempted to disclose to Country 1.  The defendant told

Country 1 as much, stating that he has "intimate knowledge of how DIA tracks and monitors user activity," Compl. ¶ 10, and describing the ways that investigations at DIA could be triggered—information that would be incredibly valuable to an individual or entity seeking to evade detection.

The defendant also explained that he had access to multiple categories of classified materials that would be of interest to a foreign government. But the defendant not only had access to that information; he also reviewed it and spent hours painstakingly transcribing it. Should the defendant be released, even the most stringent conditions imposed by this Court could do little to prevent the defendant—who is proficient in cybersecurity and encrypted communications—from exposing additional national defense information to the highest bidder or to anyone he believes could help further his cause—whether to flee or to further harm the U.S. national security. *See Dalke*, 1:22-cr-00313, Dkt. 24 (finding that the "Defendant's knowledge of the cybersecurity 'tradecraft,' which is supported by his education, training, and background" and his "ideology and expressed sympathy" for a foreign government weighed in favor of detention).

Stringent home confinement conditions would not alleviate this danger. Prohibiting or severely restricting the defendant's use of or access to the internet is "notoriously difficult to enforce." *See United States v. Ojo*, 20-0369 (SAG), 2020 WL 7707341, at *2 (D. Md. Dec. 29, 2020). This is particularly true in an age where most televisions are internet capable and where wireless access is often available from areas surrounding one's residence, even if a home's internet subscription is discontinued.[2] *See United States v. Reiner*, 468 F. Supp. 2d 393, 399 (E.D.N.Y. 2006) ("Even if the Court were to order electronic monitoring and home detention of the defendant pending trial, that condition would not adequately address his ability to access phones or computers

---

[2] This risk is particularly acute in a multi-unit apartment building in which any number of wireless connections might be available.

in his home which could be used for the types of illicit activities described above, even if steps were taken to try to prevent those items from being present or available in the house. In this day and age, with devices such as cellphones, Blackberries, and laptops, there are no conditions which can reasonably assure the safety of the community under the particular circumstances of this case if the defendant is released on bail."). And it is particularly true where, as here, the defendant lives alone and would have no one to hold him accountable.

The cost to national security is simply too high not to require the defendant's detention in this matter. A "[d]efendant's knowledge of TS/SCI does not end with termination of his TS/SCI access." *Teixeira*, 23-cr-10159 (IT), Dkt. 37 at 19. Here, the defendant transcribed more than two dozen documents and undoubtedly retains recall of those documents, as well as any number of the classified documents or information he has accessed since joining DIA in 2019. The defendant has an "intimate knowledge," Compl. ¶ 10, of DIA's counterintelligence methods—information he proved he was all too willing to share with at least one foreign government. The defendant is now only as good as his word to both abide by any conditions the Court may impose and to not further disclose U.S. national security information. But given the defendant's history of honoring other agreements—even in the face of severe consequences of which he was fully aware—the Government respectfully submits that the Court cannot balance the threat to U.S. national security on the flimsiness of the defendant's word.

As Judge Ellis previously held, "Defendants accused of espionage . . . generally pose a special danger given these defendants often possess sensitive information related to national defense that if disclosed could not only cost the lives of individual agents, soldiers, officers and diplomats stationed abroad, but in a very real sense could cost the lives of American citizens here at home. In these circumstances, courts are not required to fashion conditions that would erect a

13

virtual prison around the defendant." *Mallory*, 268 F. Supp. 3d at 866 (finding that "the government has shown by clear and convincing evidence that defendant poses a danger to both specific individuals and the community as a whole"). Such is the case here. There simply is no condition or combination of conditions that can ensure the Defendant will not further disclose additional information still in his knowledge or possession.[3] The defendant poses an unacceptable danger to the U.S. national security and to the public writ large. Detention is necessary to ensure that the defendant does not cause the breadth of harm that he anticipated when he set off on his destructive path.

## V.    CONCLUSION

Based upon the foregoing, the Government has met its burden to show that no conditions of release will reasonably assure the defendant's appearance or the safety of any person or the community. Accordingly, the Government requests the Court order the defendant detained prior to trial.

---

[3] *See United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990) ("Given the breadth of human imagination, it will always be possible to envision some set of release conditions which might reasonably assure the safety of the community. For instance, agents could be posted by the government to watch Tortora at all times to ensure that he remains compliant; the guards could search all visitors, dog Tortora's footsteps en route to all appointments, and otherwise act as private jailers. But the Bail Reform Act, as we read it, does not require release of a dangerous defendant if the only combination of conditions that would reasonably assure societal safety consists of heroic measures beyond those which can fairly be said to have been within Congress's contemplation.").

The Government further requests that, if the Court is inclined to release the defendant on conditions, it stay its order for such time as to permit the Government to file a motion for revocation of the order of release under 18 U.S.C. § 3145(a).

Respectfully submitted

Sue J. Bai
Head Supervisory Official
National Security Division
United States Department of Justice

/s/ Christina A. Clark
CHRISTINA A. CLARK
MARK MURPHY
Trial Attorneys
National Security Division
United States Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530

Erik S. Siebert
United States Attorney

/s/ Gordon Kromberg
GORDON KROMBERG
Assistant United States Attorney
2100 Jamieson Ave,
Alexandria, VA 22314

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/S/ Christina A. Clark
CHRISTINA A. CLARK
Trial Attorney

Date: June 2, 2025