IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED
IN OPEN COURT
AUG 26 2026
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

UNITED STATES OF AMERICA

v.

NATHAN VILAS LAATSCH,

Defendant.

Case No. 1:25cr109 156

STATEMENT OF FACTS

The United States and the defendant, NATHAN VILAS LAATSCH (hereinafter, "the defendant"), agree that at trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. Between on or about March 2, 2025, and on or about May 29, 2025, in Arlington, Virginia, within the Eastern District of Virginia, and elsewhere, the defendant, with the intent and reason to believe that it was to be used to the injury of the United States and to the advantage of a foreign government, did knowingly and unlawfully attempt to communicate, deliver, and transmit, to representatives of a foreign government, that is, Country 1, documents and information relating to the national defense of the United States, including a document classified Top Secret/SCI that reflected sensitive methods of intelligence collection, intelligence related to foreign military exercises, and analysis of the impact of those military exercises.

2. Until May 2025, the defendant was a resident of Alexandria, Virginia. The defendant obtained his B.S. in Cyber Security from a university in 2018, and is knowledgeable about secure methods of communication, including encrypted emails and messaging services.

3. In August 2019, the defendant became a civilian employee of the Defense Intelligence Agency ("DIA"). In the spring of 2025, he was assigned to a DIA facility in the Washington, D.C. metro area, where he worked with the Insider Threat Division as a Data Scientist and IT Specialist of Information Security. Among other things, the defendant's duties include enabling user activity monitoring on individuals with access to DIA systems, including individuals who are under investigation. The defendant's duties also include assisting external partners, such as other agencies, on the use of insider threat tools.

4. As required for his assignment at DIA, the defendant held a Top Secret security clearance, which took effect upon his entry on duty to DIA in August 2019. To acquire his security clearance, the defendant signed a lifetime binding non-disclosure agreement in which he acknowledged that the unauthorized disclosure of protected information may invoke criminal penalties prescribed by, among other statutes, 18 U.S.C. Sections 793 and 794.

5. In addition to the defendant's Top Secret clearance, he maintained access to Special Access Programs ("SAPs"), which are highly compartmentalized classified programs. In the indoctrination memoranda for the SAPs, the defendant acknowledged that "the briefing officer has made available Sections 793, 794, 798, and 952 of Title 18 United States Code . . . so that I may read them at this time, if I so choose." The defendant signed the SAP indoctrination agreement on September 6, 2022. The defendant knew that the unauthorized disclosure of Top Secret information reasonably could be expected to cause exceptionally grave damage to the national security of the United States and that the unauthorized disclosure of Secret information reasonably could be expected to cause serious damage to the national security of the United States.

6. In March 2025, and through an email account that he had just created, the defendant sent to an email account associated with a friendly foreign government ("Country 1"), a message which had the subject line, "Outreach from USA Defense Intelligence Agency (DIA) Officer," and included the following:

> I am an officer of the Defense Intelligence Agency (DIA) serving in a technical role in support of our internal Officer of Security (SEC)...
> I am willing to share classified information that I have access to, which are completed intelligence products, some unprocessed intelligence, and other assorted classified documentation.

The defendant also wrote that he had "intimate knowledge of how DIA tracks and monitors user activity." To communicate further, the defendant also provided Country 1 with a username to an encrypted messaging application that could be used to contact him.

7. Defendant also attached copies of the front and back of two of his U.S. Government identification cards (the "U.S. Government IDs"), which he said were "images of badges that I use to enter workspaces, with identifying information removed." The defendant's name and photograph were redacted from the images of the U.S. Government IDs that were sent to Country 1.

8. On March 23, 2025, using an account on the messaging application set up for this purpose, the FBI (the "FBI Agent") sent a message to defendant's messaging account. The message stated: "Good afternoon, I received your message and share your concerns. We are glad you reached out. I look forward to your response and learning more about your work." The defendant did not immediately respond.

9. On April 4, 2025, using an email account set up for this purpose, the FBI Agent sent a similar message to the defendant's email account. On April 14, 2025, the defendant responded to the FBI Agent by email, and indicated that a response had also been sent on the

messaging application. At 1:45 p.m., the defendant used the messaging account to write, "Apologies for no response until now[.] I didn't hear anything for a while and had not checked recently[.] What I originally wrote remains true. Arguably more so now."

10. After receiving the defendant's response, on April 17, 2025, the FBI Agent messaged the defendant, expressing concern to the defendant about security and requesting details about the types of information that the defendant might be able to share. Approximately two hours after receiving this message, the defendant responded, stating, among other things, that: (1) he possesses a Top Secret//SCI clearance, which allows him "access to a significant amount of information and finished products"; (2) he has access to multiple classified systems; (3) the intelligence he has access to covers multiple categories; and (4) he would need to "copy things manually," which would "somewhat limit[]" what he could provide.

11. The defendant went on to say that he could nevertheless provide several products a day.

12. On April 18, 2025, the FBI Agent again emphasized concerns about security and told the defendant that "[t]here is much to do together." Approximately four hours later, the defendant responded and provided a significant amount of detail on the monitoring and audit capabilities of the DIA and other U.S. Government agencies, including the use of specific programs and how those programs work. Certain details that the defendant provided to the FBI Agent on April 18, though used by other private actors, are classified.

13. The defendant then proposed to copy classified materials "by hand . . . to paper." The defendant explained that the "majority of products are text only or in text grids or charts that aren't difficult to copy fully" and that he could therefore copy them, "recreate them electronically and distribute to you or an otherwise determined method."

14. On April 22, 2025, the FBI Agent agreed with the defendant that manually copying and exfiltrating classified information would be the best way for the defendant to proceed. The FBI Agent also asked the defendant if he was able to access the Washington, D.C. region. Approximately eight minutes after receiving the FBI Agent's message, the defendant confirmed that his workplace was in Washington, D.C. and that he lives approximately "15 minutes from DC."

15. On April 27, 2025, the FBI Agent—who the defendant still believed to be a representative of COUNTRY 1—requested that the defendant provide "a sample" of the classified information he said he had access to so that it could be reviewed and authenticated. The FBI Agent advised that instructions on where to leave the information would subsequently be provided.

16. Approximately 25 minutes after receiving the FBI Agent's message, the defendant responded, "Expected this would be coming at some point, understood and will accommodate. I will use my personal computer to digitize what I collect." The defendant further stated that he could have the information ready approximately three to four days later.

17. On April 28, 2025, the day after receiving a request for samples for Country 1 to review, the defendant began reviewing and accessing classified information approximately 20 minutes after entering his office. Over the course of his workday on April 28, 2025, the defendant repeatedly wrote on a notepad at his desk while looking at his classified computer system. The defendant wrote multiple pages of notes, which he then removed from the notepad at his desk and folded into squares. At the end of his workday, the defendant bent under his desk, placed the folded papers into his socks, and departed the office.

18. On April 29 and April 30, 2025, the defendant again wrote information on a notepad at his desk while looking at his classified computer system. On April 29, after transcribing classified information, the defendant again removed multiple pages from the notepad, folded the pages into squares, and placed them in his socks before departing for the day. On April 30, the defendant placed multiple notebook pages in the bottom compartment of his lunchbox, and later that day departed his DIA office with the same lunchbox. On multiple occasions on both April 29 and April 30, 2025, the defendant attempted to hide his notebook when coworkers passed by his desk.

19. On April 30, 2025, approximately three hours after leaving work, the defendant sent a message to the FBI Agent stating, "Good afternoon. I have completed gathering the requested products and the drive is ready for drop off. There will be . . . nine in total. Assuming the timing remains for tomorrow it will be feasible." Later that day, the FBI Agent provided information to the defendant on how to complete the dead drop operation. The FBI Agent advised the defendant to proceed to a park located in Arlington, Virginia and provided specific instructions on where the defendant could place the drive with the information he had exfiltrated from his workplace. The defendant responded approximately 30 minutes later and stated, "Understood. I will let you know when it is done."

20. On April 30, 2025, approximately two minutes after the defendant sent a message to the FBI Agent, the defendant departed his residence and arrived within the vicinity of the dead drop location at the specified Arlington park approximately 20 minutes later, where he viewed a map of the park.

21. The next day, May 1, 2025, the defendant departing his residence and proceeded directly to the specified Arlington park. The defendant proceeded to the designated location at

the specified Arlington park, deposited an object, and then returned to his vehicle and drove to his residence.

22. Following the defendant's departure, the FBI retrieved a thumb drive from the designated location in the Arlington park, which was subsequently secured and reviewed on a classified system at the FBI. The thumb drive was found to contain a message from the defendant and nine typed documents, each containing information that was portion-marked up to the Secret or Top Secret levels.

23. The message from the defendant stated, in part:

> I am including his [*sic*] additional document to provide some additional context on the products, selection rationale, and notes having now practically done this.
>
> ***
>
> I choose to include . . . a decent sample size . . . and decently demonstrate the range of types of products. This is not all encompassing, but it should give a good idea.
>
> Whenever possible, I have retained classification markings. This in general applies to the formatting (bolding, italics, etc.) which I have tried to preserve for accuracy. This does not extend to original font, size, and visual embellishments that are sometimes used in original documents.
> . . .
>
> There was no direction provided on topics of interest, so I selected them partially based on assumed interest.
>
> I have to the best of my ability attempted to copy the products by hand, but I cannot guarantee that every single word is completely correct. If there are any mistakes, they would only be a basic word or two, and nothing that would alter the content or meaning of the product.
>
> As anticipated, the process of manually copying by hand will be time-intensive. Many of the provided products took around 40-60 minutes to fully complete, and often two full pages of notebook paper per-product. I did not choose products which were significantly longer than what I've noted as a 'standard' length.

As the defendant specified in his cover note, each of the documents on the thumb drive contained classification portion markings.

24. Eight of the nine documents contained on the thumb drive contained information portion-marked as Top Secret and contained Sensitive Compartmented Information. One of those documents, which is classified as Top Secret//SCI reflected sensitive methods of intelligence collection, intelligence related to foreign military exercises, and analysis of the impact of those military exercises.

25. On May 10, 2025, the defendant provided the FBI Agent with additional information on how internal investigations are initiated and managed at DIA, based on his role in working closely with DIA's Office of Security. The defendant also explained how he would avoid internal monitoring and stated, "it will not be easy for them, for example, to open a case on me without my knowledge since my permissions to see that would need to be changed and I'd notice." He further discussed the "stupid mistakes" others make when cases are opened on them and said these mistakes "should not be too difficult for me to avoid."

26. On May 14, 2025, the FBI Agent advised the defendant that it was prepared to receive additional classified information. The FBI Agent stated that "to maximize efficiency and impact going forward, I will provide you topics on which to focus your efforts. Topics will become more specific as we progress, depending on the reports provided . . . ." The FBI Agent then provided the defendant with three high-level topics for the defendant to focus on. The defendant responded later that same day, "Understood, I will begin to work with these topics of focus." The defendant said that he should be ready to transmit the information by the week of May 26.

27. The next day, May 15, 2025, approximately fifteen minutes after entering his office, DIA videos captured the defendant reviewing classified information on his DIA workstation. Over the course of approximately seven hours, the defendant transcribed multiple pages of notes while logged into his classified workstation. The defendant then folded multiple pages of notes and again appears to have placed the folded notes inside his socks. The defendant departed his desk approximately three minutes later.

28. Between May 16 and May 27, 2025, the defendant transcribed multiple pages of notes, while logged into his classified workstation at DIA. Each day, at the end of the day, the defendant folded the pages of notes and placed the folded notes inside his socks before departing his office.

29. On May 23, 2025, the FBI Agent advised the defendant that they would be prepared to receive additional classified information the following week. The defendant responded approximately three minutes later and stated, in pertinent part, "Nothing has changed on my end, I have been collecting on the requested topics, and next week is still good for me." When the FBI Agent later suggested that the defendant be prepared to transmit the information on Thursday, May 29, 2025, the defendant responded, "That can be done."

30. On May 28, 2025, the FBI Agent provided information to the defendant to transfer the second set of classified information. The FBI Agent advised the defendant to proceed to the picnic tables located in particular park in Arlington, Virginia and provided specific details for the defendant to electronically transfer the files.

31. On May 29, 2025, at approximately 8:37 a.m., the FBI Agent asked the defendant to confirm that "everything is OK and still on track for this afternoon?" Approximately three hours later, the defendant responded "Yes, I will be there."

32. At approximately 11:55 a.m. the defendant departed his residence in his vehicle. At approximately 12:04 p.m. the defendant arrived at a parking lot near the park in Arlington. Carrying a laptop, the defendant walked directly to the designated picnic table area and sat down. The defendant opened the laptop and begin typing. Shortly thereafter, the FBI received an electronic file transfer. Upon receipt of the file transfer, FBI arrested the defendant at the picnic table. FBI later reviewed the file transfer and identified over 20 documents containing information that was portion-marked up to the Secret or Top Secret levels.

33. Following his arrest, the defendant knowingly and voluntarily waived his right to counsel and decided to speak with FBI agents. During the course of that conversation, the defendant acknowledged that he reached out to Country 1 in an attempt to transmit classified information. The defendant said that, during the course of his communications with the FBI Agent, he believed he was speaking to an official of Country 1. The defendant admitted to transcribing classified information onto a notepad at DIA, folding those pages, putting them in his socks, and taking them home. The defendant went on to say that he retyped these handwritten notes at home. The defendant also admitted to transmitting the information on two separate occasions to the individual he believed to be an official of Country 1. The defendant also stated that he purchased an iPhone on or about February 20, 2025, for the purpose of communicating with Country 1.

34. This statement of facts includes those facts necessary to support the plea agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

We are Lauren Rosen and Valencia Roberts, the defendant's attorneys. We have carefully reviewed the above Statement of Facts with him. To our knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Lauren Rosen
Attorney for NATHAN VILAS LAATSCH

Valencia Roberts
Attorney for NATHAN VILAS LAATSCH

35. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Todd W. Blanche
Attorney General

Theophani K. Stamos
First Assistant United States Attorney

By: ______________________________
Gordon D. Kromberg
Assistant United States Attorney

______________________________
Mark Murphy
Trial Attorney
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, NATHAN VILAS LAATSCH the defendant, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

______________________________
NATHAN VILAS LAATSCH
Defendant